THIS OPINION IS CITABLE
AS PRECEDENT OF
THE T.T.A.B.

Mailed:  December 14, 2006

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

United States Playing Card Company
v.
Harbro, LLC

_____

Opposition No. 91162078
to application Serial No. 78253725
filed on May 23, 2003

_____

Lynda E. Roesch of Dinsmore & Shohl LLP for United States
Playing Card Company.

Timothy A. Flory of Van Dyke, Gardner, Linn & Burkhart, LLP
for Harbro, LLC.

_____

Before Quinn, Kuhlke and Bergsman, Administrative Trademark
Judges.

Opinion by Bergsman, Administrative Trademark Judge:

United States Playing Card Company ("opposer") filed an

opposition to the application of Harbro, LLC ("applicant")

to register the mark VEGAS for "playing cards" in

International Class 28.[1]  As grounds for opposition, opposer

asserted that the mark VEGAS as applied to playing cards is

deceptive under Section 2(a) of the Lanham Act, 15 U.S.C.

§1052(a), and is primarily geographically descriptive or

---

[1] Application Serial No. 78253725, filed on May 23, 2003,
claiming dates of first use of June 13, 2003.

primarily geographically deceptively misdescriptive under Sections 2(e)(2) and 2(e)(3) of the Lanham Act, 15 U.S.C.§1052(e)(2) and (3), respectively. In its answer, applicant denied the salient allegations in the opposition.

For the reasons set forth below, the opposition is dismissed.

A.    The Record

1.    Opposer's Testimony and Evidence

a.    Kevin Bagger Deposition

Kevin Bagger is the Director of Internet Marketing and Research for the Las Vegas Convention and Visitor's Authority ("LVCVA"). The LVCVA is the official marketing organization for Las Vegas and the surrounding communities. Mr. Bagger oversees web-marketing efforts and is familiar with efforts of the LVCVA to promote travel and tourism to Las Vegas. Mr. Bagger testified that "Vegas" means "Las Vegas, Nevada" and, accordingly, the LVCVA uses "Only Vegas" and "Whatever happens in Vegas, stays in Vegas" as promotions to reference Las Vegas. (Bagger Dep., p. 10, Exhibits 27, 28). According to Mr. Bagger, Las Vegas is considered the entertainment capital of the world and it has become one of the best-known domestic and international tourist destinations. (Bagger Dep., p. 7). Las Vegas entertainment includes live shows, golf, fine dining, spas,

and gaming. (Bagger Dep., p. 8). Gaming involves games of chance, including slot machines, blackjack, craps, and other games that use playing cards. (Bagger Dep., p. 9). Casino playing cards are recycled and resold in gift shops in Las Vegas hotels. (Bagger Dep., p. 20).[2]

  b. Daniel Espenscheid Deposition

Daniel Espenscheid is the Casino Sales Manager for opposer. Mr. Espenscheid is responsible for supplying playing cards to Las Vegas casinos and managing opposer's Las Vegas warehouse where the playing cards are stored. Opposer supplies playing cards to approximately 85% of the Las Vegas casinos.

---

[2] The author of an article in the November 28, 2000 issue of the *Kansas City Star* (attached to opposer's second notice of reliance) explains the resale market for casino playing cards:

> Casinos cannot simply throw used cards away. State regulators typically require permanent destruction or defacing of each card to ensure none pops out of the sleeve of a card cheat one day.
>
> As a result, card recycling is a Las Vegas cottage industry. Baranowski said recyclers competed with one another for boxes of used cards that have been drilled through by casinos or have had their corners clipped.
>
> These entrepreneurs then hand-sort the cards into complete decks for secondary sales as Las Vegas souvenirs. The casino gets a small cut or a percentage of the sorted decks for resale in their own shops.

Regarding the market for used casino cards, Mr. Espenscheid testified as follows:

> There is a secondary use where companies come in, local companies come in after the cards are used, they're canceled, this company will reconstitute the decks and they're marked as being used and then they're resold into retail and also throughout the country in different retail stores.

(Espenscheid Dep., pp. 13). Mr. Espenscheid identified "canceled" decks of playing cards from seven (7) casinos. Each deck had a seal with a legend to the effect that "These cards were used in actual play in the casino." (Espenscheid Dep. pp. 36-40; Exhibits 20-26).

Mr. Espenscheid explained that the canceled decks of playing cards were good souvenirs because "[t]hese were the customized decks that were actually in play on the tables." (Espenscheid Dep. pp. 39-40).

Mr. Espenscheid also testified that applicant's VEGAS brand playing cards are printed in China on paper from Germany while applicant itself is located in Michigan.

> Q: This is number 7. Opposer's Exhibit 7 is a deck of cards with the seal broken. We've opened these cards up just so you know. I'll ask you to identify Exhibit 7.
>
> A. It is a Vegas brand playing card.
>
> Q. Do you know who makes that?
>
> A. Harbro Company.
>
> Q. Can you tell us where it's made? Does it say anywhere on that?

> A. The cards are printed in China, they're made on paper from Germany and the codings actually are from US.
>
> Q. Where is Harbro located?
>
> A. In Brighton, Michigan.

(Espenscheid Dep., pp. 22-23, Exhibit 7). Moreover, Mr. Espenscheid confirmed that to his "understanding" all of the playing cards used in Las Vegas are manufactured elsewhere. (Espenscheid Dep. p. 45).

c. Opposer's Notice of Reliance

Opposer filed a notice of reliance pursuant to Trademark Rule 2.122(e) with references to over 630 articles from printed publications, namely newspapers and magazines. The notice of reliance included an entry from Merriam-Webster's Geographical Dictionary, p. 633 (3rd ed. 1997) that explained that Las Vegas is "often shortened to Vegas." The definition of "Vegas" in the same dictionary referenced "Las Vegas." *Id.* at 1254. Opposer explained that the entries are relevant to prove that "Vegas" refers to Las Vegas, Nevada, and that there is a connection (*i.e.,* a goods/place association) between playing cards and Las Vegas.

2. Applicant's Testimony and Evidence

a. Karl Ondersma Deposition

Karl Ondersma is an associate in the law firm representing applicant. Referencing Espenscheid Exhibit Nos. 10, 12, and 15 (websites advertising the sale of canceled casino playing cards), Mr. Ondersma visited those websites, as well as other linked sites, and determined that the companies identified therein were not located in Las Vegas. Also, Mr. Ondersma purchased playing cards from Gameland Sports (identified as Espenscheid Exhibit 10) located in Detroit, Michigan.

b. Applicant's Notice of Reliance

Applicant filed a notice of reliance making of record four trademark registrations for playing cards:

| Mark | Registration No. | Status |
|------|------------------|--------|
| TAHOE | 1,189,273 | Canceled |
| NEVADA | 726,940 | Renewed in 2002 |
| CLUB RENO | 401,715 | Canceled |
| BROADWAY | 172,312 | Renewed in 2003 |

Opposer owns the TAHOE and BROADWAY registrations.

3. Opposer's Rebuttal Evidence

a. Joseph Robinette Deposition

Joseph Robinette is opposer's General Counsel. Mr. Robinette approved an advertisement for a promotion by Kroger Company for the World Poker Tour. The advertisement

featured playing cards manufactured by opposer for the World Poker Tour.

        b.    Kathryn Przywara Deposition

Kathryn Przywara is an attorney at the law firm representing opposer. Ms. Przywara visited websites that advertise and sell canceled playing cards from Las Vegas casinos. Ms. Przywara also purchased a charm bracelet featuring playing cards from the Las Vegas Centennial website.

        c.    Opposer's Notice of Reliance

Opposer filed a second notice of reliance with additional newspaper and magazine articles purportedly to show that Las Vegas is a known geographic location associated with playing cards.

4.    Applicant's Objections To Opposer's Evidence

With its brief, applicant filed an objection to opposer's rebuttal testimony on the ground that it was improper rebuttal. Applicant also lodged objections to internet printouts and documents introduced during the Espenscheid Deposition (Opposer's Exhibits 2-6, 10, 12-19), to testimony proffered by Mr. Espenscheid and Mr. Bagger, and to opposer's first notice of reliance. The various grounds of objection include hearsay, leading questions, lack of foundation, evidence not admissible by notice of

reliance, and untimely filing of the testimony and other evidence.

With respect to opposer's rebuttal testimony and second notice of reliance filed during its rebuttal testimony period, we agree with applicant that the testimony and other evidence constitute improper rebuttal. Evidence which should constitute part of opposer's case in chief, but which is made of record during the rebuttal period, is not considered when applicant objects.

> Applicant is entitled to an opportunity to rebut, during its testimony period, any testimony and evidence proffered in support of the allegations in the notice of opposition. This opportunity is foreclosed if opposer withholds the evidence until its rebuttal testimony period, ***which is intended to be limited to denials, refutations or explanations of applicant's testimony and evidence.*** (Emphasis added).

*General Electric Company v. Graham Magnetics Incorporated*, 197 U.S.P.Q. 690, 692 n.5 (T.T.A.B. 1977). Notwithstanding opposer's argument that testimony and evidence submitted during the rebuttal period directly rebutted applicant's testimony, we find that opposer's rebuttal testimony and evidence is merely cumulative evidence relating to the use of "Vegas" as a reference to "Las Vegas," and the association between Las Vegas and playing cards.[3] Opposer's

---

[3] With respect to its second notice of reliance, opposer explained that "The materials are relevant to demonstrate that the term 'VEGAS' is used primarily to refer to the city of Las

8

rebuttal testimony did not refute or explain applicant's testimony, but rather added to its proofs made as part of its case in chief.  Accordingly, the testimony and evidence submitted by opposer during its rebuttal testimony period have not been considered.[4]

With respect to the remaining objections, because an opposition is akin to a bench trial, the Board is capable of assessing the proper evidentiary weight to be accorded the testimony and evidence, taking into account the imperfections surrounding the admissibility of such testimony and evidence.  Thus, we have considered the evidence, keeping in mind the objections, and have accorded whatever probative value the testimony and evidence merits.

B.    Federal Registration of Geographic Trademarks

As applied to geographic marks, Section 2 of the Lanham Act provides the following:

1.    If the geographic term is deceptive under Section 2(a), the term may not be registered under any circumstances;

---

Vegas, Nevada. . . and to illustrate a connection between playing cards and the city of Las Vegas, NV."

[4] Nevertheless, even if we considered such testimony and evidence, it would not change our decision on the merits because such matter was unnecessarily cumulative, and it failed to include any evidence relating to whether the purported misleading use of VEGAS was a material fact in the purchasing decision.

2.  If the geographic term is "primarily geographically descriptive" under Section 2(e)(2), the term may be registered on the Supplemental Register or upon a showing of acquired distinctiveness; or,

3.  If the geographic term is "primarily geographically deceptively misdescriptive" under Section 2(e)(3), the term may not be registered under any circumstances. [5]

1.  Section 2(a) - Geographically Deceptive Marks.

With respect to the interplay between Section 2(a) and Section 2(e)(3), the Court of Appeals for the Federal Circuit held that the test for determining whether a mark is geographically deceptive under Section 2(a) is the same as determining whether a mark is primarily geographically deceptively misdescriptive under Section 2(e)(3). *In re California Innovations Inc.*, 329 F.3d 1334, 66 USPQ2d 1853, 1856 (Fed. Cir. 2003). The Court explained that the analysis for primarily geographically deceptively misdescriptive marks focuses on the deception of, or fraud

---

[5] There is an exception. If a primarily geographically deceptively misdescriptive mark has been in lawful use in commerce since before December 8, 1993 (the date of enactment of the NAFTA Implementation Act), it may be registered on the Supplemental Register or it may be registered on the Principal Register under the provisions of Section 2(f) upon a showing of acquired distinctiveness.

on, the consumer, and, therefore, requires a showing of public deception (*i.e.,* that consumers have been misled). *Id.* To ensure a showing of deceptiveness, a plaintiff (or the Patent and Trademark Office) must prove that the goods-place association made by the consumer is material to the consumer's decision to purchase the goods. *Id.* at 1857-1858. "The addition of a materiality inquiry equates this test with the elevated standard applied under §1052(a)." *Id.* Because the same legal standard applies to both sections 2(a) and 2(e)(3) of the Lanham Act, the Court instructed the Patent and Trademark Office to address the deceptiveness of a geographic term under the ambit of Section 2(e)(3) rather than Section 2(a). *Id.* at 66 USPQ2d 1858. Accordingly, we analyze whether the mark VEGAS for playing cards is primarily geographically deceptively misdescriptive under Section 2(e)(3).

2.  Section 2(e)(2) – Primarily Geographically Descriptive.

The distinction between a mark that is primarily geographically descriptive or primarily geographically deceptively misdescriptive is whether the geographic origin of the goods is in the place named in the mark. *In re Jacques Bernier Inc.,* 894 F.2d 394, 13 USPQ2d 1725, 1726 (Fed. Cir. 1990). In the case *sub judice,* opposer has not tried to prove that applicant's playing cards are made or

11

sold in Las Vegas. Mr. Espenscheid testified that applicant's playing cards are printed in China, while applicant is located in Michigan. Mr. Espenscheid also testified that all playing cards used in Las Vegas are manufactured elsewhere. Accordingly, the only issue before us, and the only one the parties have argued, is whether the mark VEGAS is primarily geographically deceptively misdescriptive when applied to playing cards.

3. Section 2(e)(3) – Primarily Geographically Deceptively Misdescriptive.

To prove that VEGAS for playing cards is primarily geographically deceptively misdescriptive, opposer must prove the following:

a. The primary significance of VEGAS is a generally known geographic location;

b. The consuming public is likely to believe that VEGAS indicates the origin of the playing cards, when in fact the playing cards do not come from Las Vegas; and,

c. The misrepresentation is a material factor in the consumer's decision.

*In re California Innovations Inc.,* 66 USPQ2d at 1858.

a.   The Primary Significance Of "Vegas" Is "Las Vegas".

The first prong of the test is whether the mark's primary significance is a generally known geographic location.  The evidence clearly demonstrates that the word "Vegas" is an abbreviation for Las Vegas.

> **Las Vegas** . . . 1. often shortened to Vegas. City, of Clark co. (sic), SE corner of Nevada. . . major tourist resort featuring legalized gambling and glitzy hotels.

Merriam-Webster's Geographical Dictionary, *supra* at 633. The remaining documents in opposer's first notice of reliance make it clear that "Vegas" is a commonly used and understood reference to Las Vegas, Nevada.  Further the record establishes that Las Vegas, Nevada is a generally known geographic location.

b.   There Is A Tenuous Goods-Place Association.

The second prong of the test requires proof that the public is likely to believe that applicant's playing cards originate in Las Vegas. "Under this prong, we consider whether the public would reasonably identify or associate the goods sold under the mark with the geographic location contained in the mark."  *In re Save Venice New York Inc.,* 259 F.3d 1346, 59 USPQ2d 1778, 1783 (Fed. Cir. 2001). Opposer has submitted evidence sufficient to prove that Las Vegas is well-known for, *inter alia*, casinos and gambling. Because playing cards are closely associated with gambling,

13

there is an indirect association between Las Vegas and playing cards. *In re Save Venice New York Inc.,* 59 USPQ2d at 1784 ("the registrability of a geographic mark may be measured against the public's association of that region with both its traditional goods ***and any related goods or services that the public is likely to believe originate there.*** The essence of the test is whether consumers are likely to be confused by the source of the related goods identified by a distinctive geographic mark." (Emphasis added)). Despite the lack of any evidence demonstrating a consumer association directly between playing cards and Las Vegas, because of the association of Las Vegas with casinos and gambling and the association of gambling with playing cards, consumers may associate playing cards with Las Vegas. Accordingly, we find that there is a goods-place association between playing cards and Las Vegas.

   c. There Is No Evidence Regarding Whether The Use Of The Mark VEGAS Is A Material Factor In The Consumer's Decision To Purchase.

  The final prong of the three-part test requires proof that the misleading goods-place association is a material factor in the customer's decision to purchase applicant's playing cards. The materiality prong supports the statutory requirement of deception. *In re Les Halles De Paris J.V.,* 334 F.3d 1371, 67 USPQ2d 1539, 1542 (Fed. Cir. 2003); *In re California Innovations Inc.,* 66 USPQ2d at 1856.

Opposer argues that it has met the materiality factor by proving that there is a market for canceled casino cards from Las Vegas casinos. By demonstrating that there is a market for canceled casino cards, opposer asserts that it has proven that consumers are interested in obtaining cards that have an origin in or are associated with Las Vegas. In addition, opposer argues that the Board may infer that the geographic deception is a material factor in the purchasing decision when there is a "heightened" goods-place association.

Neither opposer's evidence, nor its arguments, is persuasive. Although the evidence demonstrates that consumers are interested in obtaining cards that were used in casinos, the evidence does not establish that they are interested in purchasing playing cards that were manufactured or used in Las Vegas. Opposer's witness Daniel Espenscheid testified that the canceled playing cards were good souvenirs because they "were actually in play on the tables," not because they were from Las Vegas. (Espenscheid Dep. pp. 39-40). The entities selling the canceled playing cards tout that the cards were formerly used in the casinos, as opposed to being made or used in Las Vegas. The representative decks of canceled playing cards all have a seal with a legend to the effect that "These cards were used in actual play in the casino." (Espenscheid Dep. pp. 36-40;

15

Exhibits 20-26). Only Espenscheid Exhibit 20, the deck from the MGM Grand, referenced Las Vegas. In that instance, the commercial impression engendered therein is that the MGM Grand is located in Las Vegas, as opposed to the identification of Las Vegas as the geographic origin of the cards.

We decline to draw an inference that the geographic misrepresentation is a material factor in the purchasing decision. First, as indicated in the previous paragraph, the evidence shows that consumers purchase canceled casino playing cards because they were used in casinos, not because they were made or used in Las Vegas.

Second, to raise an inference of materiality, opposer must show a "heightened" association between the goods and the geographic location. *In re Les Halles De Paris J.V.,* 67 USPQ2d at 1542 (the Patent and Trademark Office may raise an inference of materiality with evidence that the place is famous as a source of the goods at issue).[6] The record does not show that a material reason for a tourist's choice of playing cards is that the cards were made or used in Las Vegas. At best, the evidence (including opposer's rebuttal evidence) shows that tourists want cards that were used in

---

[6] *But see, In re California Innovations Inc.,* 66 USPQ2d at 1857 (while the goods-place association may raise an inference of deception, a mere inference is not enough to establish whether the misrepresentation was a material factor in the consumer's decision).

casinos, not necessarily cards made or used in Las Vegas. The fact that the casinos are located in Las Vegas does not mean that Las Vegas and casinos are one and the same.

We disagree with opposer's conclusion that "the goods-place association between Las Vegas and playing cards is so strong that the Board may presume that the geographical connection between the place and the goods led to the consumer's decision to purchase the goods." (Opposer's Brief, p. 23). This is simply attorney argument without support in the record. As noted above, the goods-place association between playing cards and VEGAS is merely indirect, attained through their association with the casino and gambling services associated with Las Vegas.

In view of the foregoing, we find that, as applied to playing cards, VEGAS is neither primarily geographically descriptive nor primarily geographically deceptively misdescriptive.

Decision: The opposition is dismissed.